UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:12-CV-24349-MIDDLEBROOKS/BRANNON

WI-LAN USA, INC.,

       Plaintiff,

vs.

RESEARCH IN MOTION LIMITED and
RESEARCH IN MOTION CORPORATION,

       Defendants.

_____

**<u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>**

# **TABLE OF CONTENTS**

I.     Background .................................................................................................... 1

II.    Tenets of Claim Construction ....................................................................... 3

III.   Arguments ................................................................................................... 6

    A.   The Claims Should be Limited to Paging Networks ........................................ 6

    B.   Wi-LAN's Attempts to Re-write "Determining the Portions of a Data Link Layer"
        Should be Rejected ........................................................................................... 12

        1.   "Determining" Should Not Be Rewritten to Mean "Deciding or Selecting." ............... 12

        2.   The Claim Should Not be Rewritten as Determining "A Type of Data" ...................... 13

    C.   BlackBerry's Construction of the "Assigning" Steps Should Be Adopted .................... 15

        1.   "A portion of the data link layer segments" Is "a portion of data within
            the data link layer." ........................................................................................... 15

        2.   The Claimed "Assigning" Occurs at the Data Link Layer ........................................ 18

    D.   Claim 8 is a Means-Plus-Function Claim That Is Inadequately
        Supported and Indefinite ..................................................................................... 20

        1.   Law on Means-Plus-Function Claims ............................................................ 22

        2.   Claim 8 Is a Means-Plus-Function Claim and Should Be Construed
            Pursuant to § 112(f) ........................................................................................ 23

        3.   The Specification Fails to Describe Sufficient Structure to Support Claim 8's
            Means-Plus-Function Terms ............................................................................. 26

IV.   Conclusion ..................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Aspex Eyewear, Inc. v. Designer's Eyewear Studio*,
No. 02-20609, 2006 U.S. Dist. LEXIS 98027 (S.D. Fla. Dec. 21, 2006) .................. 22, 24, 25

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.,*,
288 Fed. App'x 697  (Fed. Cir. 2008)........................................................................ 23, 25

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) ................................................................................ 6, 13

*Bd. of Regents v. BenQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008)........................................................................................ 9

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) ....................................................................................... 5

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
132 F.3d 701 (Fed. Cir. 1997) ........................................................................................ 5

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
No. 2012-1120, 2013 U.S. App. LEXIS 7550 (Fed. Cir. Apr. 16, 2013). ................... 5, 11

*Cobra Int'l, Inc. v. BCNY Int'l, Inc.*,
05-61225-CIV-MARRA, 2008 U.S. Dist. LEXIS 48815
(S.D. Fla. June 18, 2008)............................................................................................... 22

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
412 F.3d 1291 (Fed. Cir. 2005) ..................................................................................... 23

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ................................................................................ 10, 17

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
629 F.3d 1278 (Fed. Cir. 2010) ............................................................................... 4, 9, 11

*Ergo Licensing, LLC v. Carefusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012) ..................................................................................... 23

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
616 F.3d 1357 (Fed. Cir. 2010) ....................................................................................... 3

*Function Media, LLC v. Google Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) ............................................................................ 22, 23, 28

*Honeywell Int'l, Inc. v. ITT Indus.*,
452 F.3d 1312 (Fed. Cir. 2006) ..................................................................................... 11

*Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
  132 F.3d 701 (Fed. Cir. 1997) ................................................................... 5

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ................................................................. 4

*Kara Tech, Inc v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) ................................................................. 4

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004) ........................................................... 22, 25

*Marine Polymer Techs., Inc. v. Hemcon, Inc.*,
  672 F.3d 1350 (Fed. Cir. 2012) ....................................................... 6, 10, 11

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 368, 387 (1996) ........................................................................... 3

*Mas-Hamilton Group v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998) ....................................................... 22, 24, 25

*Mass. Inst. of Tech. v. Abacus Software*,
  462 F.3d 1344 (Fed.Cir.2006) ................................................................. 22

*Mems Tech. Berhad v. ITC*,
  447 Fed. App'x 142 (Fed. Cir. 2011) ......................................................... 7

*Merck & Co. v.Teva Pharms. USA. Inc.*,
  347 F.3d 1367 (Fed. Cir. 2003) ............................................................... 19

*Netcraft Corp. v. Ebay, Inc.*,
  549 F.3d 1394 (Fed. Cir. 2008) ............................................................... 10

*Noah Sys., Inc. v. Intuit, Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012) ............................................................... 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ................................................................. 4

*Pedicraft, Inc. v. Stryker Corp.*, No. 3:02-cv-334,
  2003 U.S. Dist. LEXIS 27837 (M.D. Fla. May 5, 2003) ........................... 22

*Personalized Media Commc'n, LLC v. Int'l Trade Comm'n*,
  161 F.3d 696 (Fed. Cir. 1998) ........................................................... 22, 26

*Phillips v. AWH Corp.*,
  415 F.3d 1303, 1312 (Fed. Cir. 2005) ................................................. 3, 4, 5, 12

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir 2001) ................................................................. 4

*Rhodia Chimie v. PPG Indus. Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005) ........................................................................ 9

*Saffran v. Johnson & Johnson*, No. 2012-1043,
   2013 U.S. App. LEXIS 6795 (Fed. Cir. Apr. 4, 2013) ................................. 9, 10

*Seachange Int'l, Inc. v. C-COR, Inc.*
   413 F.3d 1361 (Fed. Cir. 2005) ......................................... 6, 7, 8, 9, 10, 13

*Shire Dev. LLC v. Watson Pharms, Inc.*,
   No. 12-60862-CIV-Middlebrooks/Brannon,
   2013 U.S. Dist. LEXIS 8566 (S.D. Fla. Jan. 17, 2013) ........................... 4, 5, 26

*Superguide Corp. v. DirectTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ........................................................................ 4

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) .................................................................... 16

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................................................ 3, 4, 5, 6

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
   595 F.3d 1340 (Fed. Cir. 2010) .................................................................... 10

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) ...................................................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .................................................................. 4, 18

*Welker Bearing Co. v. PHD, Inc.*,
   528 F. Supp. 2d 683 (E.D. Mich. 2007) ........................................................ 25

*Welker Bearing Co. v. PHD, Inc.*,
   550 F.3d 1090 (Fed. Cir. 2008) .................................................................... 25

## STATUTES

35 U.S.C. § 112(f) ........................................ 19, 21, 22, 23, 24, 25, 26, 28

## I.  <u>Background</u>

Defendants Research in Motion Limited and Research in Motion Corporation (collectively "BlackBerry") submit Defendants' Opening Claim Construction Brief pursuant to the Court's Order Granting in Part Defendants' Motion to Modify Trial Date and Pre-Trial Deadlines (D.E. 35).

Wi-LAN has asserted claims 5 and 8 of U.S. Patent No. 6,260,168 (Exh. A,[1] "the '168 patent") ("Asserted Claims").  As stated in the Parties' Joint Claim Construction Statement (D.E. 65), the parties dispute the meaning of the following terms (in bold): (1) **performing data communication**, (2) **determining the portions of a data link layer**, (3) "**assigning a portion of the data link layer segments** to be forward error correction coded **and a second portion** to be unprotected by FEC" and "**assigning a first portion of the data link layer segment** to be forward error correction coded **and a second portion** to be unprotected by FEC," (4) "**a first component for determining the portions of a data link layer that do not require forward error correction coding**," and (5) "**a second component for assigning a first portion of the data link layer segment to be forward error correction coded and a second portion to be unprotected by FEC according to the first component determination**."

The '168 patent relates to data communications on a paging network.  Paging networks are simply networks for pagers, also referred to as beepers.  The '168 Patent, filed 15 years ago in 1998, is entitled, "Paging System Having Optional Forward Error Correcting Code Transmission at the Data Link Layer."  Forward error correction ("FEC") relates to resolving errors during data transmission.  Nearly every communication channel is susceptible to noise and

---

[1] "Exh. ___" refers to the like identified exhibit attached to the Declaration of Jeremy T. Elman in Support of Defendants' Opening Clam Construction Brief, filed concurrently herewith.

interference, which may cause errors.  FEC techniques have been developed to help control and correct these errors.  Use of FEC in paging networks was well known before the '168 patent was filed.  '168 patent at col. 1:46-50 ("In a paging environment, it is the data link layer that is responsible for both error detection and correction using a forward error correction (FEC) technique, *well-known to people skilled in the art of paging and radio data protocols*.") (emphasis added).

The information to be transmitted on the paging network affects whether to apply FEC.  As stated in the background section of the patent, FEC may be essential to some types of data, but not others.  '168 patent at col. 1:50-53.  For example, voice information may tolerate some errors in transmission and may not require FEC.  *Id.*  The same may not be true for other types of data, such as financial information.  *See id.*  Persons of skill in the art were well aware that selection of error control may depend on the type of information being transmitted.

The alleged invention in the '168 patent relates to this selective use of FEC  in a paging network.  Claim 5 is representative:

> 5. A method for performing data communication comprising:
>    determining the portions of a data link layer that do not require forward error correction coding; and
>    assigning a portion of the data link layer segments to be forward error correction coded and a second portion to be unprotected by FEC according to the data link layer determination.

'168 patent at col. 4:28-35.  During prosecution of the '168 patent, the inventor summarized his invention to the United States Patent & Trademark Office ("USPTO") as follows:

> [T]he present invention is directed to a method and system of formulating and communicating paging messages via a data link layer in a paging network in which portions of the data link layer (*i.e.*, some portions of the data stream) are error protected, and other portions of the same data link layer are not error protected.

Exh. B at WILANRIM071-72.  The USPTO allowed the claims on April 4, 2001.  *Id.* at

WILANRIM074.  The patent examiner provided his "Reasons for Allowance":

> The prior arts of record, however, failed to teach or suggest singly or in combination a method and system of formulating and communicating paging messages via a data link layer in a paging network in which portion of the data link layer are error protected, and other portions of the same data link layer are not error protected.

*Id.* at WILANRIM075.

Wi-LAN is not the original owner of the '168 patent.  According to the USPTO's assignment database, the inventor, Andrei Godoroja assigned his rights in the '168 patent to Glenayre Electronics, Inc. on December 21, 1998.  Mr. Godoraja worked at Glenayre, which made pagers (among other products).  On June 30, 2011, Glenayre assigned the patent to Wi-LAN Inc.  Glenayre no longer exists.  On January 6, 2012, Wi-LAN Inc. assigned the patent to Plaintiff Wi-LAN USA, Inc.  ("Wi-LAN").  Wi-LAN brought this lawsuit against BlackBerry on December 10, 2012.

## II.      Tenets of Claim Construction

Claim interpretation is a matter of law, akin to contract interpretation.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 368, 387 (1996).  Claim construction assists the jury by defining claim terms that do not have a plain meaning.  *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").  The claims of a patent define the invention and the patentee's right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is the claims [of a patent] that define the metes and bounds of the patentee's invention.")  Claim construction inquires into what one skilled in the art would have understood a claim term to mean at the time of invention.  *Phillips*, 415 F.3d at 1313.

To construe a claim term, a court considers "the intrinsic evidence of record, *i.e.*, the

patent itself, including the claims, the specification and, if in evidence, the prosecution history," in that order. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Shire Dev. LLC v. Watson Pharms, Inc.*, No. 12-60862-CIV-Middlebrooks/Brannon, 2013 U.S. Dist. LEXIS 8566, at *9-10 (S.D. Fla. Jan. 17, 2013).  Claim construction must begin and remain centered on the claim language itself.  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir 2001).  Other claims may offer guidance to the meaning of a term, such as by offering context for a disputed term or by highlighting differences within or between the claims.  *Phillips*, 415 F.3d. at 1314.

The claims "must be read in view of the specification."  *Id.* at 1315 (citations omitted).  The specification "is the single best guide to the meaning of a disputed term."  *Id.* at 1315 (citations omitted).  The specification, however, "is not a substitute for, nor can it be used to rewrite, the chosen claim language."  *Superguide Corp. v. DirectTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).  "The claims, not specification embodiments, define the scope of patent protection."  *Kara Tech, Inc v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009).  While the specification may be used to inform the meaning of a term, "[w]e do not read limitations from the specification into claims; we do not redefine words."  *Thorner*, 669 at 1366.

A court should also consult the prosecution history, which offers evidence of how the USPTO and the inventor understood the claims of a patent.  *Phillips*, 415 F.3d at 1317.  A patentee may surrender claim scope through disavowals made during prosecution. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323-24 (Fed. Cir. 2009); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  For example, disavowal exists where the patentee distinguishes the claimed invention to overcome a prior art rejection.  *ERBE*

4

*Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1285-86 (Fed. Cir. 2010); *Vita-Mix*, 581 F.3d at 1323-24; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1273-74 (Fed. Cir. 2001).  This prosecution history disclaimer is important to the patent system because it promotes the public notice function of the intrinsic record and protects the public reliance on statements made to the USPTO.  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, No. 2012-1120, 2013 U.S. App. LEXIS 7550, at *11 (Fed. Cir. Apr. 16, 2013).

Extrinsic evidence, including technical dictionaries and testimony of experts is less reliable than the intrinsic evidence.  *Phillips*, 415 F.3d at 1317-19.  Extrinsic evidence may only be consulted if a review of the intrinsic evidence is inconclusive.  *Shire Dev.*, 2013 U.S. Dist. LEXIS 8566, at *28.  Extrinsic evidence may not be used to override the intrinsic evidence. *Phillips*, 415 F.3d at 1324.  Accordingly, "any expert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight."  *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) (finding that the district court's reliance on expert testimony on claim construction was legal error because the intrinsic evidence was unambiguous and contrary).

A term is presumed to enjoy its ordinary and customary meaning.  *Thorner*, 669 F.3d at 1365.  "We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.'"  *Phillips*, 415 F.3d at 1312 (citations omitted).  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

Once the ordinary meaning of a term is ascertained, a court may diverge from the ordinary meaning only when the patentee either "sets out a definition and acts as [its] own

lexicographer" or "disavows the full scope of a claim term either in the specification or during prosecution." *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (*quoting* Thorner, 669 F.3d at 1365). For example, an inventor's definition of what "the present invention is" may limit the claims. *Marine Polymer Techs., Inc. v. Hemcon, Inc.*, 672 F.3d 1350, 1358-59 (Fed. Cir. 2012) (en banc). Or, in another example, statements made to the USPTO to distinguish prior art may also limit the claims. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005).

## III.    Arguments

### A.    The Claims Should Be Limited to Paging Networks.

| Term | BlackBerry's Construction | Wi-LAN's Construction |
| --- | --- | --- |
| performing data communication<br><br>(appears in claims 5 and 8) | performing data communication on a paging network | Wi-LAN's position is that no construction is necessary. If the Court finds construction necessary, this claim language means "transmitting data". Wi-LAN reserves the right to identify a rebuttal construction. |

The parties dispute whether the claims should be limited to paging networks. Although the Asserted Claims do not explicitly recite "a paging network," as discussed below, the invention – as the inventor distinguished it from the prior art and explicitly defined it in the intrinsic record – is specific to paging networks and should be limited to the same.[2]  *See Aventis Pharma*, 675 F.3d at 1330 (stating that disclaimers made to the USPTO to distinguish prior art or inventor definitions limit otherwise broader claim scope).

---

[2] The adoption of BlackBerry's construction would likely be case dispositive because Wi-LAN alleges the Bluetooth standard infringes, but Bluetooth is not operated on a paging network.

The patent is certainly directed to paging networks.  The patent specification discloses that the invention is limited to paging networks.  The '168 patent is titled "Paging System."[3] The "Background of the Invention" is directed towards "[p]aging systems."  '168 patent at 1:11; *see also id.* at 1:13-25, 1:46-50.  "The data link layer," used throughout the claims, is defined as the layer "[i]n a paging environment" responsible for FEC.  *Id.* at 1:46-50.  Additionally, "FIG. 1 is a block diagram of a paging/communication system for implementing *the present invention*." *Id.* at col. 2:31-32 (emphasis added).  Other parts of the specification are similarly dedicated to paging networks.  *Id.* at 2:42-65.  In these instances, the inventor defined his "invention" to be specific to paging networks.

Not only did the inventor reiterate this definition during prosecution of the '168 patent, but he also relied on this definition to overcome the USPTO's rejections of his application to gain allowance of the '168 patent.  The facts in this case are strikingly similar to *Seachange.*  413 F.3d 1361.  In *Seachange*, the relevant claim term was "network for data communications" in independent claim 37 of that patent-in-suit.  *Id.* at 1368.  The defendant asserted that the term should be limited to "point-to-point" communications.  *Id.*  The plaintiff raised a claim differentiation argument – independent claim 37 should not be limited to "point-to-point" communications because independent claim 1, not claim 37, recites that limitation.  *Id.* at 1368-69.  Reminding the plaintiff that claim differentiation is just a claim construction tool, the Federal Circuit Court of Appeals limited claim 37 to "point-to-point" communications based on prosecution history disclaimer.  *Id.* at 1372.  During prosecution, the examiner rejected a group of claims including claims 1 and 37.  *Id.* at 1373.  In response, the patent applicant "treat[ed]

---

[3] Titles are part of the specification and can be used to limit claims.  *See, e.g.*, *Mems Tech. Berhad v. ITC*, 447 Fed. App'x 142, 154 (Fed. Cir. 2011).

[claim 1] as being representative of the group," even though claim 37 did not recite "point-to-point" communication. *Id.* Among other arguments, the patent applicant used claim 1's "point-to-point" limitation to overcome the rejection. *Id.* The applicant "made no separate patentability argument for claim 37." *Id.* In other words, the patent applicant told the USPTO that all the claims were patentable because of the "point-to-point" element, even though not all the claims recited that limitation. *See id.* Based on these representations, the Federal Circuit reasoned that the applicant "linked" independent claims 1 and 37 with the "point-to-point" argument and that those linked claims, whether they explicitly recited "point-to-point" communications or not, are properly limited to "point-to-point" communications. *Id.* Accordingly, "it would be improper to now broadly construe [claim 37] not to contain those limitations." *Id.*

Here, like *Seachange*, the Examiner rejected a group of claims including claims 1, 5, and 8. Exh. B at WILANRIM056. In response, the applicant argued the following:

> In contrast to the [prior art], *the present invention* is directed to a method and system of formulating and communicating *paging messages* via a data link layer *in a paging network* in which portions of the data link layer (*i.e.*, some portions of the data stream) are error protected, and other portions of the same data link layer are not error protected.[4]

*Id.* at WILANRIM071-72 (emphasis added). The patent applicant then concluded that "[i]n view of the above, . . . claims 1 and 3-8 pending in the present application define the invention over the prior art." *Id.* at WILANRIM070-72. The applicant made no separate patentability argument for claims 5 and 8. *Id.* Instead, the applicant established a clear link – a paging network – between the patentability of claim 1 and the patentability of claims 5 and 8, even though the

---

[4] The patentee did not rely on this "paging network" limitation in responding to the USPTO's first rejection of the claims. WILANRIM049-52. It was after the USPTO's second office action that the patentee identified "the present invention" as being on paging networks, after which the patent examiner allowed the claims.

latter did not explicitly recite "a paging network."  *Id.*  The facts demand limiting these claims

because the Examiner issued the claims based on this very link:

> The prior arts of record, however, failed to teach or suggest singly or in combination a method and system of formulating and communicating *paging messages* via a data link layer *in a paging network* in which portion of the data link layer are error protected, and other portions of the same data link layer are not error protected as set forth in claims 1, 4, 5, and 8.

Exh. B at WILANRIM075 (emphasis added).  A patentee cannot say one thing to the USPTO to

obtain a patent and then say another to a court to assert infringement.  *Bd. of Regents v. BenQ*

*Am. Corp.*, 533 F.3d 1362, 1373 (Fed. Cir. 2008); *Rhodia Chimie v. PPG Indus. Inc.*, 402 F.3d

1371, 1384 (Fed. Cir. 2005).  As in *Seachange*, this Court should construe claims 5 and 8 to

operate in "a paging network."

The Federal Circuit's decision in *ERBE* is also instructive.  629 F.3d at 1286-87.  In

*ERBE*, the disputed term was "low flow rate."  *Id.* at 1285.  During prosecution, the patentee

distinguished prior art because the prior art flow rate would lead to flow velocities of 19 to 229

km/h.  *Id.*  The USPTO then allowed the claims.  *Id.* at 1286.  During litigation, the patentee

argued that claim differentiation precluded narrowing the claims based on this 19 to 229 km/h

distinction.  *Id.*  That argument was rejected.  *Id.* at 1286-87.  The Federal Circuit again stressed

that claim differentiation is just a tool.  *Id.*  Claim differentiation could not void these statements

made to the USPTO.  *Id.*

Lest there be any doubt, the Federal Circuit reaffirmed these principles less than a month

ago in *Saffran v. Johnson & Johnson*, No. 2012-1043, 2013 U.S. App. LEXIS 6795 (Fed. Cir.

Apr. 4, 2013).  Finding prosecution disclaimer, the Federal Circuit emphasized that "applicants

rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following . . .'

during prosecution and need not do so to meet the applicable standard."  *Id.* at 18-19.  The

Federal Circuit also reiterated the rule that, even when multiple grounds of distinction are used to overcome a USPTO rejection, any one such ground disclaims claim scope. *Id.* at 18. The Federal Circuit also highlighted that, like here, the examiner shared the applicant's view of the claimed invention in the reasons for allowance. *Id.*

Further support for BlackBerry's construction is found in the patentee's numerous definitive characterizations of "the present invention." As discussed above, statements in the specification, including the title of the patent, define the "invention" to be in "a paging network." During prosecution, the patentee similarly explicitly defined "the *present invention* [to be] directed to . . . formulating and communicating *paging messages* . . . in *a paging network*." Exh. B at WILANRIM071 (emphasis added). The patent examiner shared this same view of the claim scope. *Id.* at WILANRIM075. The patentee also described "The Present Invention" by distinguishing data link layers in "conventional paging systems." *Id.* at WILANRIM069-70. These statements are precisely the sorts of "definitive statements . . . the interested public was entitled to [rely upon]." *Saffran*, 2013 U.S. App. LEXIS 6795, at *16. When an inventor states what "the present invention" is, that definition controls. *See, e.g., Marine Polymer*, 672 F.3d at 1358-59 (limiting claims where the patentee described what "the invention" is in the specification); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 2010) (limiting claims to a manual mouse click because the specification states that "the present invention addresses this problem with a one click centering feature"); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (limiting the claimed invention to intraluminal devices because the patentee described "the present invention" or "this invention" as an intraluminal graft); *Netcraft Corp. v. Ebay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008) (agreeing with the district court that the use of the phrase "the present invention" describes the

invention as a whole); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing claim term to include a fuel filter because the patentee referred to the fuel filter as "this invention" and "the present invention" and because "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter").   In both the specification and the prosecution history, the inventor identified and distinguished "the present invention" because it was limited to paging networks, and thus the Asserted Claims should be limited to paging networks.

BlackBerry expects Wi-LAN to assert that claim differentiation dictates that claims 5 and 8 cannot be limited to paging networks because claims 1 and 4 explicitly recite a paging network.   This argument is the same argument rejected in *Seachange* and *ERBE*, discussed at length above.   As the Federal Circuit held in those cases, claim differentiation is by no means a rule; it is just one of many claim construction tools.   *ERBE*, 629 F.3d at 1286-87; *Seachange*, 413 F.3d at 1372; *see also Marine Polymer*, 672 F.3d at 1358-59 (relegating claim differentiation where the patentee described what "the invention" is in the specification).   Claim differentiation succumbs to inventor definitions of what "the present invention" is or to disavowal of claim scope to persuade the USPTO to allow the claims.   *See, e.g., Marine Polymer*, 672 F.3d at 1358-59; *Seachange*, 413 F.3d at 1372; *see also Biogen*, 2013 U.S. App. LEXIS 7550, at *17 (stating that Federal Circuit precedent "makes clear" that prosecution history disclaimer trumps claim differentiation).   Wi-LAN's anticipated claim differentiation should be rejected.

For the reasons stated above, the Asserted Claims should be limited to "paging networks," and "performing data communication" should be construed to be "performing data communication *on a paging network*."

B.    Wi-LAN's Attempts to Re-write "Determining the Portions of a Data Link Layer"
      Should be Rejected.

| Term | BlackBerry's Construction | Wi-LAN's Construction |
|---|---|---|
| determining the portions of a data link layer<br><br>(appears in claims 5 and 8) | determining the portions of data within the data link layer | deciding or selecting which parts of the data of a data link layer are a type of data |

The parties appear to agree in principle that "portions of a data link layer" should be construed as portions[5] *of data* within[6] the data link layer.[7]  Two main issues are disputed: (1) whether "determining" means "deciding or selecting" and (2) whether the claim element should be construed as determining which parts of data are a type of data to be FEC coded.

   1.    *"Determining" Should Not Be Rewritten to Mean "Deciding or Selecting."*

"Determining" does not require construction or Wi-LAN's proposed rewrite.  This term is the epitome of a term that has a plain and ordinary meaning.  *See Phillips*, 415 F.3d at 1314. This Court and a jury are fully equipped to understand the meaning of "determining."  Wi-LAN's equating of "determining" with "deciding or selecting" is an unabashed attempt to improperly rewrite the claims.   Absent an explicit definition in the intrinsic evidence or

---

[5] Wi-LAN proposes that "portions" be replaced with "parts."  The plain meaning of "portions" is readily apparent and need not be defined.  Because there is no justification for rewriting this term, the Court should reject Wi-LAN's proposal to change "portions" to "parts."

[6] Wi-LAN proposes "data *of* a data link layer," and not "*within* a data link layer."  The specification, however, never mentions "data of a data link layer."   Rather, it twice describes "data within the data link layer."  '168 patent at Abstract, col. 2:1.  Wi-LAN's proposed use of "of" should be rejected.

[7] Wi-LAN proposes "a data link layer" instead of "the data link layer."  It is unclear what a portion of "a" layer could be.  Instead, the intrinsic evidence makes clear that the portions of the data link layer are portions of the data that is within "the data link layer."  *See, e.g.,* '168 patent at col. 1:62-63 ("data in the data link layer"), col. 2:1 ("data within the data link layer"), col. 2:67 ("data in the data link layer"), col. 3:1-2 ("data link layer data"); Exh. B at WILANRIM071 ("portions of the data link layer (*i.e.*, some portions of the data stream)").

disavowal of claim scope, the ordinary meaning of the term must govern. *Aventis Pharma S.A.*, 675 F.3d at 1330.

        2.      *The Claim Should Not Be Rewritten as Determining "A Type of Data."*

Again, Wi-LAN asks this Court to improperly rewrite the claims. Wi-LAN's motives are transparent – Wi-LAN seeks to distinguish invalidating prior art by asking this Court to rewrite the claims. This request should be denied.

Wi-LAN proposes that the claim element reads as follows: "deciding or selecting which parts of the data of a data link layer are a type of data that do not require forward error correction coding." The specific dispute is whether the step requires categorizing the portions (or parts) as "a type of data" that does not require FEC. Nothing in the intrinsic evidence supports this construction categorizing data as a "type."

The claims themselves do not support this construction. Nothing in the claims requires or implies that the determining step be one that determines that a *type* of data not be FEC coded. The claims only recite determining *portions* of data that do not require FEC coding. In fact, Wi-LAN's rewrite creates a grammatical error. Instead of the claim reading "portions . . . that do not require [FEC]," Wi-LAN's rewrite would read "a type . . . that *do* not require [FEC]."

The specification similarly does not support determining whether portions of data are "a type of data." "Types of data" is mentioned once in the specification, in the "Background of the Invention": "Error detection and correction are vital for alphanumeric and binary data, but some types of data, such as voice data, may be designed to allow a certain amount of errors in transmission and therefore do not require FEC." '168 patent col. 1:50-53. This background statement is not a definition or disavowal redefining the scope of the claims. Instead, this use makes clear that the inventor understood that different types of data exist, yet chose not to use that language in his claims. If the patentee had meant to claim that "a type of data" is

determined, it would have said so.

In fact, the specification supports BlackBerry's construction.  The specification supports that the determination is of portions of data, which require or do not require FEC, regardless of types of data.  *See* '168 patent at col. 2:2-4 ("a determination is made as to what data in the data link layer is required to be FEC encoded and what data is not required to be FEC encoded"), col. 2:8-11 ("determines the portions required to be FEC encoded"), col. 3:6-8 ("the application determines the portions of the data to be transmitted that do not require FEC").  Wi-LAN's rewrite would exclude these embodiments.

The prosecution history further contradicts Wi-LAN's construction.  Although the inventor recognized that some types of data may require FEC and some types of data may not, the inventor clearly stated that, "in accordance with *the present invention*, a determination is made as to *which* data in the data link layer is required to be FEC encoded and *which* data is not required to be FEC encoded."  Exh. B at WILANRIM050-51 (emphasis added).  "*The present invention* recognizes that not all of *the data* at the data link layer requires the same degree of reliability."  Exh. B at WILANRIM070 (emphasis added).  Simply put, the inventor did disavow claim scope to limit the claims to determining which "types of data" require FEC coding.

Wi-LAN's construction should be rejected.  The claims do not recite determining the "types of data" that require FEC coding.  Wi-LAN cannot demonstrate a definition or disavowal that would read this limitation into the claims.

C.      BlackBerry's Construction of the "Assigning" Steps Should Be Adopted

| Term | BlackBerry's Construction | Wi-LAN's Construction |
|---|---|---|
| **assigning a portion of the data link layer segments** to be forward error correction coded **and a second portion** to be unprotected by FEC<br><br>(appears in claim 5)<br><br>**-and-**<br><br>**assigning a first portion of the data link layer segment** to be forward error correction coded **and a second portion** to be unprotected by FEC<br><br>(appears in claims 8) | **Assigning, at the data link layer, a first portion of data within the data link layer** to be forward error correction coded **and a second portion of data within the data link layer** to be unprotected by FEC | **Assigning a first part of the data of one of the data link layer segments** to be forward error correction coded **and a second part of the data of the same segment** to be unprotected by FEC<br><br>**-and-**<br><br>**assigning a first part of the data of one data link layer segment** to be forward error correction coded **and a second part of the data of the same segment** to be unprotected by FEC |

Again, the parties appear to agree that "a portion" of a data link layer segment should be construed as a portion[8] *of data* therein. The main disputes are (1) whether "a portion of the data link layer segments" means "a first portion of data on the data link layer" (without segments) or, instead, "a first part of the data of one of the data link layer segments" and (2) whether the assigning step occurs at the data link layer.

     1.      *"A portion of the data link layer segments" Is "a portion of data within the data link layer."*

Wi-LAN's proposal is that the "assigning" be to "a first part of the data of *one of the data link layer segments* . . . and a second part of the data of *the same segment*." (emphasis added). The claims do not support this construction. The patentee used multiple "segments" – plural in

---

[8] Wi-LAN proposes that "portion" be replaced with "part." The plain meaning of "portion" is readily apparent and need not be defined. Because this distinction is one without a difference, the Court should not rewrite the claims per Wi-LAN's proposal.

claim 5.  The claim does not recite a single "segment" that is assigned as Wi-LAN proposes in its constructions.  Moreover, the specification supporting selectively using FEC on "segments" – plural – does not define the term to mean "one of the . . . segments" and "the same segment."  *See* '168 patent, col. 3:14-18 (disclosing that portions of "segments" are partitioned into FEC and non-FEC "segments"); col. 2:12-14 (disclosing that "data link layer segments with the protected and unprotected portions are transmitted.").

Wi-LAN seeks to improperly limit this claim term to a preferred embodiment where the data in the data link layer has a single segment with FEC protected and unprotected data.  This rewrite is not supported by the claims or the specification, and the Federal Circuit has clearly stated that claims are not limited to disclosed embodiments.  *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002).  The specification does not define what "data link layer segments" are, but rather discloses only a diagram of a "data link layer segment."  This diagram is in Figure 3, which includes a header block, an address block, protected data components, and unprotected data components.  '168 patent at col. 3:21-32.  As shown below, the intrinsic evidence is not so narrow as to what portion of data is being assigned.  Instead, it discloses an embodiment that "assign[s] forward error correction (FEC) to data link (medium access) layer transmission data."  '168 patent at col. 2:42-43.  There is no support for Wi-LAN's exclusion of disclosed embodiments where the portion that are FEC coded are in a segment different from a segment that is not FEC coded.[9]

BlackBerry's construction is fully supported by the intrinsic evidence.  The claims are properly read such that "a portion of data link layer segments (to be forward error correction

---

[9] Wi-LAN's construction further suffers from being itself ambiguous.  Wi-LAN's construction does not identify bounds of what forms a segment.  In other words, Wi-LAN's construction does not identify what delineates one segment from another.

coded)" is simply "portions of data within the data link layer (to be forward error correction coded)."  A "portion of the data link layer segments" has the same meaning as "portion of data within the data link layer."  They are used interchangeably and therefore should have the same meaning.  *Edwards Lifesciences*, 582 F.3d at 1329 ("The interchangeable use of the two terms is akin to a definition equating the two.").

The Asserted Claims support this construction.  In these claims, the "portion of the data link layer" is determined and then "*said* portion of the data link layer *segments*" is assigned. This antecedent support shows that "portion of the data link layer" is the same as "portion of the data link layer segments."   Claim 1 provides further support that these terms are used interchangeably:

> determining the *portions of said data link layer* that require forward error correction coding *as a first portion*;
> determining the *portions of said data link layer* that do not require forward error correciton [sic] coding *as a second portion*; and
> assigning *said first portion of the data link layer segments* to be forward error correction coded and *said second portion* to be unprotected by forward error correction.

'168 patent at col. 4:1-9 (emphasis added).  As claim 1 indicates, "a first portion" is the "portions of said data link layer" and later refers to "*said first portion* of the data link layer *segments*."  *Id.* Thus, "a portion of the data link layer segments" is used interchangeably with "a portion of the data link layer" and should share the same meaning.

BlackBerry's proposed construction embraces the various embodiments disclosed in the specification and prosecution history.  The specification describes "assigning" FEC only once. '168 patent at col. 2:42-43.  Here, it says "assigning forward error correction (FEC) to data link (medium access) layer transmission data."  *Id.*  It does not limit the "assigning" to data link layer segments.  In other instances, the specification confirms that what is being assigned is simply

data within the data link layer.  For example, the "Summary of the Invention" provides:

> In accordance with this invention . . . First, a determination is made as to what data in the data link layer is required to be FEC encoded and what data is not required to be FEC encoded. Next, the data link layer data determined to require FEC encoding is protected by FEC and the remaining data link layer data is not FEC protected.

*Id.* at 1:66-2:7; *see also id.* at Abstract, col. 3:8-10.

The prosecution history further confirms that the inventor understood "a portion of the data link layer segments" to mean "a portion of data link layer data."  For example, the inventor stated that "[t]he present invention enables portions of the same data stream to be error protected and other portions to not be error protected."  Exh. B at WILANRIM070.  Wi-LAN's proposed construction reads these embodiments of assigning data or parts of a data stream out of the claims, instead limiting the claims to "segments" of data.  A claim interpretation that excludes a disclosed embodiment is "rarely, if ever, correct."  *See Vitronics*, 90 F.3d at 1583.

### 2.    The Claimed "Assigning" Occurs at the Data Link Layer.

Reading the claims in context of the intrinsic evidence, the claimed "assigning" step occurs "at the data link layer."  The intrinsic record demands this construction.  First, the claims themselves support this construction.  Because the claims recite "assigning a portion of data link layer segments," it logically follows that the assigning occurs at the data link layer.  No claims recite that this "assigning" could happen at any other layer.

The specification further demands the same.  The inventor stated, in the "Background of the Invention," that, at least at the time the patent was filed, it was "well-known to people skilled in the art of paging and radio data protocols" that "the data link layer [] is *responsible* for both error detection and correction using a forward error correction ("FEC") technique."  '168 patent at 1:46-50 (emphasis added).  In other words, at the time, it was well known that the data link layer is responsible for FEC.  Being responsible for FEC means assigning FEC.  Thus, it was

18

well known that the data link layer assigns FEC.

If the claims are construed such that the "assigning" can happen on a layer other than the data link layer, then the claims will run afoul of the support in the specification. As stated above, the specification does not disclose that FEC may be assigned elsewhere. If the claims are construed beyond the scope of support in the specification, then the claims will fail a 35 U.S.C. § 112 analysis. *See* 35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same."); *Merck & Co. v. Teva Pharms. USA. Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification.").

The prosecution history also requires this construction. During prosecution, the inventor stated "the *present invention* is directed to . . . *formulating* and communicating paging messages *via* a data link layer." Exh. B at WILANRIM071 (emphasis added). The USPTO also understood that, in the Asserted Claims, the data link layer "formulat[es]" the paging messages to be protected and unprotected by FEC. *Id.* at WILANRIM075. The inventor also told the USPTO that "the data link layer is set up to *ensure* a reliable data communication," including for transmission of FEC coded data. *Id.* at WILANRIM050 (emphasis added). The inventor also said that "[t]he data link layer *governs* . . . communication . . . between the hardware at different hosts." *Id.* at WILANRIM070 (emphasis added). These statements characterizing the invention's data link layer formulating, ensuring, and governing FEC dictate that the data link layer performs the assigning function.

D.    Claim 8 Is a Means-Plus-Function Claim That Is Inadequately Supported and
      Indefinite

| Term | BlackBerry's Construction | Wi-LAN's Construction |
|---|---|---|
| a first component for determining the portions of a data link layer that do not require forward error correction coding | This element is a means-plus-function element.<br><br><br><br><br>The structure is a software "data application coupled to a processing unit."<br><br>The function is "determining the portions of data within the data link layer that do not require forward error correction coding."<br><br>Because the structure is software, an algorithm must be disclosed for performing the function for the claim to be definite. The specification fails to disclose requisite accompanying structure, and, therefore, the claim is invalid for being indefinite. | This claim element is not a means-plus-function element. The term "component" means: "hardware and/or software that forms part of a larger system".<br><br>If the Court finds this element is a means-plus-function element, then:<br><br>The structure corresponding to this element is:<br><br>   software (e.g., voice data application software or binary data application software) for executing the algorithm disclosed in the specification. See, e.g., col. 2, ll. 66 - col. 3, ll. 18 (and the Figures referenced therein).<br><br>The function corresponding to this element is:<br><br>   deciding or selecting which parts of the data of a data link layer are a type of data that do not require forward error correction coding |

| a second component for assigning a first portion of the data link layer segment to be forward error correction coded and a second portion to be unprotected by FEC according to the first component determination | This element is a means-plus-function element. | This claim element is not a means-plus-function element. The term "component" means: "hardware and/or software that forms part of a larger system".<br><br>If the Court finds this element is a means-plus-function element, then: |
| | | |
| | The structure is a software "data application coupled to a processing unit."<br><br>The function is "assigning, at the data link layer, a first portion of data within the data link layer to be forward error correction coded and a second portion of data within the data link layer to be unprotected by FEC according to the first component determination."<br><br>Because the structure is software, an algorithm must be disclosed for performing the function for the claim to be definite. The specification fails to disclose requisite accompanying structure, and, therefore, the claim is invalid for being indefinite. | The structure corresponding to this element is:<br><br>a processing unit for executing the algorithm disclosed in the specification. <u>See, e.g.</u>, col. 2, ll. 42-50, col. 2, ll. 66 - col. 3, ll. 43 (and the Figures referenced therein).<br><br>The function corresponding to this element is:<br><br>assigning a first part of the data of one data link layer segment to be forward error correction coded and a second part of the data of the same segment to be unprotected by FEC according to the first component determination |

Beyond the disputes above, which apply to both claims 5 and 8, the parties main dispute regarding claim 8 alone is (1) whether "a first component for . . ." and "a second component for . . ." should be construed under 35 U.S.C. § 112(f); and, if so, (2) whether the specification recites sufficient structure for performing the method.

1.    *Law on Means-Plus-Function Claims*

"It is axiomatic that claims must 'particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention.'"  *Function Media, LLC v. Google Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013) (quoting 35 U.S.C. § 112(f)).[10]   Section 112(f) permits a limited exception, permitting an inventor to claim a function while protecting a "means" for performing that function.  *See* 35 U.S.C. § 112(f).  The tradeoff is that the specification must sufficiently describe to one skilled in the art the structure that corresponds to the 112(f) term.  *Function Media*, 708 F.3d at 1317.

Although the use of the phrase "means for" generally triggers § 112(f), the absence of the phrase does not preclude the application of 35 U.S.C. § 112(f).  *See, e.g.*, *Mas-Hamilton Group v. LaGard, In.c*, 156 F.3d 1206 (Fed. Cir. 1998); *Aspex Eyewear, Inc. v. Designer's Eyewear Studio*, No. 02-20609, 2006 U.S. Dist. LEXIS 98027, at *14 (S.D. Fla. Dec. 21, 2006); *Pedicraft, Inc. v. Stryker Corp.*, No. 3:02-cv-334, 2003 U.S. Dist. LEXIS 27837, at *46-47 (M.D. Fla. May 5, 2003).  "In determining whether [§ 112(f) applies] 'the focus remains on whether the claim as properly construed recites sufficiently definite structure'" to perform the claimed function.  *Aspex Eyewear*, 2006 U.S. Dist. LEXIS 98027, at *14 (quoting *Personalized Media Commcn's, LLC v. Int'l Trade Com'n*, 161 F.3d 696, 704 (Fed. Cir. 1998)); *see also Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006); *Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, 05-61225-CIV-MARRA, 2008 U.S. Dist. LEXIS 48815, at *8 (S.D. Fla. June 18, 2008).  A phrase that is simply "a verbal construct" that is not recognized as structure, but is simply a substitute for "means for" is construed under § 112(f).  *Lighting World, Inc. v.*

---

[10]  The Leahy-Smith America Invents Act reformatted the paragraphs of § 112 as subsections.  Former paragraph 6 is now subsection (f).

*Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004).  Examples of such generic structural terms are "element," and "device."  *Id.*; *see also Aspex Eyewear Inc. v. Altair Eyewear, Inc.*, 288 Fed. App'x 697 (Fed. Cir. 2008) (stating that generic terms like 'mechanism,' 'means,' 'element,' and 'device' typically do not connote sufficiently definite structure) (quoting *Abacus Software*, 462 F.3d at 1353).

A § 112(f) term is indefinite if the specification fails to sufficiently describe to one skilled in the art the structure for performing the claimed function.  Software means-plus-function claims are no exception.  The Federal Circuit has specifically addressed the requisite disclosure to render a software means-plus-function term definite.  "It is well settled that '[s]imply disclosing software [] 'without providing some detail about the means to accomplish the function[,] is not enough.'"  *Function Media*, 708 F.3d at 1318 (quoting *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012)).  The disclosed structure must be more than just a disclosure of a computer or microprocessor.  *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012).   "When dealing with a 'special purpose computer-implemented means-plus-function limitation,' we require the specification to disclose the algorithm for performing the function."  *Function Media*, 708 F.3d at 1318.  "Importantly, we have said that '[w]hile it is true that the patentee need not disclose details of structures well known in the art, . . . the specification must nonetheless disclose *some* structure.'  *Id.* (quoting *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005)).  If such an algorithm is not disclosed, then the term is indefinite, and the claim is invalid.  *Id.* at 1319.

> 2. *Claim 8 Is a Means-Plus-Function Claim and Should Be Construed Pursuant to § 112(f).*

The phrases "a first component for determining . . ." and "a second component for

assigning . . ." are purely functional and should be construed pursuant to § 112(f).  The inventor's motive in writing claim 8 is transparent.  Claim 8, a system claim, tracks claim 5, a method claim, nearly verbatim but for the injection of "a [] component for" prior to the "determining" and "assigning" functions.  Nothing else is substantively different between the claims.  "A component for," is simply a generic word to cover anything that performs the "determining" or "assigning" steps of claim 5.  Wi-LAN contends that, by saying "a component for" instead of "means for," the inventor did not invoke § 112(f).  This contention is incorrect.

The Federal Circuit's *Mas-Hamilton* decision is informative and analogous.  In *Mas-Hamilton*, the court held that "a lever moving element for moving . . ." and "a movable link member for holding . . ." are means-plus-function terms.  156 F.3d at 1214-16.  Regarding the former, the court held that "'a moving element' could be any device that can cause the lever to move.  [The] claim, however, cannot be construed so broadly to cover every conceivable way or means to perform the function of moving a lever, and there is no structure recited in the limitation that would save it from application of section 112, ¶ 6."  *Id.* at 1214.  Regarding the latter, the court held that "the subsequent functional language [after "a movable link member"] requires two functions: (1) 'for holding the lever . . .' and (2) 'for releasing the lever . . .'" and that "a movable link member" did not "provide any structure as necessary to remove this limitation from the ambit of section 112, ¶ 6."  *Id.* at 1215.  These terms did not recite sufficient structure and were, therefore, deemed to be within the ambit of § 112(f).

This Court faithfully adhered to *Mas-Hamilton* in its *Aspex Eyewear* decision.  In *Aspex Eyewear*, the claim term at issue was "two retaining mechanisms for supporting a pair of lenses."  2006 U.S. Dist. LEXIS 98027 at *15.  This Court held that the phrase retaining mechanism "is purely functional" because "[i]t states what the retaining mechanisms *do*, not what the retaining

mechanisms *are*." *Id.* (emphasis in original); *see also Aspex Eyewear Inc.*, 288 Fed. App'x at 704 (affirming conclusion that "retaining mechanisms" invokes § 112(f)). "There is no indication of the nature of the structure of these retaining mechanisms." *Id.* Thus, because the term "two retaining mechanisms for supporting . . ." was purely functional and lacked sufficient structure, this Court ruled that § 112(f) applies.

Here, claim 8 recites "a first component for determining . . ." and "a second component for assigning . . . ." The term "component" is generic and "could be any device that" determines or assigns. The '168 patent uses "component" generically, like "device" or "element." For example, it uses the term to describe not only software and hardware, but also simply data. *See, e.g.,* '168 patent at 3:5-6, Fig.1, 3:28-29, 3:35-38. Anything can be a component. Such generic use of a term is like the term "device" or "element." Indeed, a component for determining or assigning is purely functional like "retaining mechanisms for supporting . . ." in *Aspex Eyewear*. In *Mas-Hamilton*, *Aspex Eyewear*, and here, a generic structural element precedes "for," followed by a function.[11]  *See Welker Bearing Co. v. PHD, Inc.*, 528 F. Supp. 2d 683 (E.D. Mich. 2007)*, aff'd,* 550 F.3d 1090, 1096–97 (Fed. Cir. 2008) (holding "a mechanism for moving" to be a 112(f) limitation). This verbal construct has the same meaning as "means for."

This is not a situation where the term at issue is a structure named after its function. In *Lighting World*, the Federal Circuit distinguished *Mas-Hamilton*. The Court noted "the pertinent distinction" between generic structural terms and terms whose name stems from its function:

> The court in *Personalized Media Communications* drew the pertinent distinction in holding that the term "detector," although broad, is still structural for purposes of *section 112* P 6 because it "is not a generic structural term such as 'means,' 'element,' or 'device'; nor is it a coined term lacking a clear meaning such as 'widget' or 'ram-a-fram.'"

---

[11]  In fact, "component" is probably more generic, structurally, than "moving element," "moving link member," or "retaining mechanisms."

*Lighting World*, 382 F.3d at 1361 (quoting *Personalized Media Commc'ns., LLC. v. ITC*, 161 F.3d 696, 704 (Fed. Cir. 1998)).  That Court provided the following examples of terms that are not generic structural terms or coined terms lacking clear meaning: "digital detector," "eyeglass hanger member," "reciprocating member," or "sealingly connected" joints.  *Id.*  "Component" is not in this category, but rather is a generic structural term that lacks clear meaning.

Wi-LAN seeks to improperly narrow "component" to avoid § 112(f) to be "hardware and/or software that forms part of a larger system."  Wi-LAN's construction contradicts the specification.  In three instances, the specification uses "component" to describe data, not "hardware and/or software."  '168 patent at Fig.1, 3:28-29, 3:35-38.  The inventor did not limit "component" to "hardware and/or software."  When the specification provides two uses of a term, the term should be construed to include both uses.  *See Shire Dev.*, 2013 U.S. Dist. LEXIS 8566, at *20-21 (construing "dispersed" to include "homogenous dispersion" and "simple dispersion" because the specification used "disperse" both ways).  Despite these uses of "component," Wi-LAN proposes to narrow this term to avoid § 112(f).  Wi-LAN cannot escape the full scope of the term by importing limitations from intrinsic evidence to avoid § 112(f).

> ### 3. The Specification Fails to Describe Sufficient Structure to Support Claim 8's Means-Plus-Function Terms

If the Court finds that these two terms are means-plus-function terms, then the Court must determine the intended function and then determine whether the specification describes a structure to perform that function.  Putting aside the disputes on the meaning of claim language after "determining" and "assigning," which are briefed above, the parties agree that the two functions are the full claim limitation following the first and second "component for."  The

26

parties also generally agree that the structure requires disclosure of an algorithm.[12]  The dispute,

then, is whether the structure provided in the specification is sufficiently definite to support the

§ 112(f) claim.

For the "first component," Wi-LAN's proposed structure is "software (e.g., voice data

application software or binary data application software[13]) for executing the algorithm in the

specification."  Not only does the portion of the specification Wi-LAN cites fail to disclose the

requisite algorithm, but the entirety of the specification is bereft of such an algorithm.  At best,

the specification simply reiterates the function and does not recite an algorithm for carrying out

that function.  The portion of the specification that Wi-LAN cites simply states that "the

application determines the portions of the data to be transmitted that do not require FEC" and

that "[t]ypically, . . . a voice data application may determine that voice data do not require FEC."

'168 patent at col. 3:6-13; *see also* Fig. 2 (showing a flow chart with an initial block stating

"determine the portions of the data link layer that do not require FEC").  The disclosure simply

reiterates that the software performs the function of "determining the portions of a data link layer

that do not require forward error correction coding."  This disclosure does not provide an

*algorithm* for carrying out the determining function.

*Function Media* is instructive.  In that case, the patentee simply pointed to a "Presentation

Generating Program" ("PGP") to support the software function "means for transmitting []

---

[12] In one instance Wi-LAN asserts the structure as "software . . . for executing the algorithm disclosed in the specification," and in the other instance, "a processing unit for executing the algorithm disclosed in the specification."  BlackBerry similarly proposes that the structure is a "data application coupled to a processing unit" that is software.   In all instances, an algorithm must be disclosed to render the 112(f) terms definite.

[13] The specification states that "a binary data application would determine that *all of the data would require FEC*."  '168 patent at 3:11-12.  This statement cannot support the claimed function of "determining the portions . . . that do *not* require [FEC.]".

presentations." *Function Media*, 708 F.3d at 1318.  The specification disclosed that the PGP "either transmits the presentation . . . or holds it."  *Id.*  The Federal Circuit held that this description of a "PGP is 'simply an abstraction that describes the function' to be performed."  *Id.* The court found the claim indefinite for lacking an algorithm.  Here, as in *Function Media*, the specification simply reiterates the claimed function, without more, and is therefore indefinite.

The "second component" suffers the same flaw.  Wi-LAN's proposed structure is "a processing unit for executing the algorithm disclosed in the specification."  The specification, however, is silent as to how the "assigning" function is carried out.  At best, it states that "[t]he processing unit 12 prepares the data link layer data for transmission based on what the application has designated."  '168 patent at col. 3, lines 1-3.  It also states that "the processing unit 12 partitions the data link layer segments into FEC and non-FEC sections according to the application–indicated portions that do not require FEC."  *Id.* at col. 3:14-17.  These disclosures simply reiterate the function to be performed; they do *not* provide an algorithm for assigning a first portion of the data link layer segment to be forward error correction coded and a second portion to be unprotected by FEC according to the first component determination.  Since there is no algorithm disclosed, the claim is indefinite if construed under § 112(f) as is proper.

IV.   <u>**Conclusion**</u>

For the reasons stated above, the Court should adopt BlackBerry's proposed constructions and reject Wi-LAN's proposed constructions.

**McDERMOTT WILL & EMERY LLP**

By:   <u>/s/ *Marcos Daniel Jiménez*</u>
Marcos Daniel Jiménez (FBN 441503)
*mjimenez@mwe.com*
Sarah Chapin Columbia (admitted *pro hac vice*)
*scolumbia@mwe.com*
Jeremy T. Elman (FBN 37448)
*jelman@mwe.com*
Leigh J. Martinson (admitted *pro hac vice*)
*lmartinson@mwe.com*
Robert M. Kline (FBN 46363)
*rkline@mwe.com*
Hasan M. Rashid (FBN 64046) (admitted *pro hac vice*)
*hrashid@mwe.com*
Kevin E. Gaunt (FBN 68818)
*kgaunt@mwe.com*
333 Avenue of the Americas, Ste. 4500
Miami, Florida 33131
Tel. 305.358.3500
Fax 305.347.6500


*Counsel for Defendants Research in Motion*
*Limited and Research in Motion Corporation*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by notices of electronic filing generated by CM/ECF on May 1, 2013, on all counsel or parties of record on the Service List below.

_____/s/ Jeremy T. Elman_____
Jeremy T. Elman

## SERVICE LIST

**CARLSON & LEWITTES PA**
Curtis David Carlson  FBN 236640
_carlson@carlson-law.net_
1 SE Third Avenue, Suite 1200
Miami, FL 33131
Telephone: 305-372-9700
Facsimile: 305-372-8265

_Attorneys for Plaintiff Wi-LAN USA, Inc._

**CARLSON, CASPERS, VANDERBURG, LINDQUIST, & SCHUMAN, P.A.**
Alan G. Carlson (MN# 14,801)
_acarlson@carlsoncaspers.com_
Dennis C. Bremer (MN# 299,182)
_dbremer@carlsoncaspers.com_
Philip P. Caspers (MN# 192,569)
_pcaspers@carlsoncaspers.com_
William F. Bullard (MN# 391,013)
_wbullard@carlsoncaspers.com_
Samuel A. Hamer (MN# 294,469)
_shamer@carlsoncaspers.com_
225 South Sixth Street, Suite 4200
Minneapolis, MN  55402
Telephone: (612) 436-9600
Facsimile: (612) 436-9605

_Attorneys for Plaintiff Wi-LAN USA, Inc._